**BLOOMFIELD STEAMSHIP CO.,**
Plaintiff,

v.

**UNITED STATES of America,**
Defendant.

Civ. A. No. 13809.

United States District Court
S. D. Texas,
Houston Division.
March 13, 1964.

---

Eikel, Feltner & Goller, Robert Eikel, Houston, Tex., for plaintiff.

Woodrow Seals, U. S. Atty. for Southern District of Texas, Jack Shepherd and Alan Raywid, Admiralty and Shipping Section, U. S. Dept. of Justice, for defendant.

*Memorandum Opinion and Order:*

NOEL, District Judge.

This action is brought under 28 U.S.C. A. §§ 1331 and 2201 by Bloomfield Steamship Co., hereinafter called Bloomfield,

a Delaware corporation with its principal office in Houston, Texas, engaged in the operation of United States-flag vessels under a subsidy agreement with the Maritime Administration. Bloomfield seeks a declaratory judgment of non-liability for claims in excess of $270,000 which are asserted by the United States government by virtue of alleged freight overcharges on government-financed grain shipments. The government has counterclaimed for money had and received in the amount of the alleged freight overcharges. This Court has jurisdiction.

At trial on January 13 and 14, 1964, the Court heard testimony and received in evidence the various depositions and exhibits filed herein and offered by counsel. In addition, the Court has been aided by comprehensive briefs and the able argument of counsel which was heard on January 16, 1964.

The government views the matter as a simple one, and argues that under regulations of the International Cooperation Administration, hereinafter called I.C.A., it has the right to recover freight payments made by it on government-financed I.C.A. grain shipments to the extent the shipping rates charged by Bloomfield for such shipments exceeded rates for comparable service charged commercial shippers.[1]

During the years 1958 and 1959, numerous parcel shipments, i. e., less than full shiploads, of bulk grain were transported aboard Bloomfield vessels from United States Gulf ports to ports of Northern Europe. Those shipments have been classified as either commercial or government-financed.

The commercial shipments were of grain which was privately contracted for and shipped in accordance with normal commercial practices by individual private shippers. Freight rates on such shipments were arrived at by negotiation either in Germany or in the United States between agents representing the shipper or consignee and agents representing the ship. These negotiations culminated in fixtures or agreements as to the terms of shipment, and were reduced to writings, called booking notes, which were signed by the negotiators.

Each shipment classified as government-financed was paid for by United States government funds and shipped aboard a United States-flag vessel to comply with the provisions of the Cargo Preference Act, 46 U.S.C.A. § 1241. The relevant portion of that Act, the meaning and effect of which are very much at issue in this action, provides that on government-financed shipments such as those involved here

> the appropriate agency or agencies shall take such steps as may be necessary and practicable to assure that at least 50 per centum of the gross tonnage * * * which may be transported on ocean vessels *shall be transported on privately owned United States-flag commercial vessels,* to the extent such vessels are available *at fair and reasonable rates for United States-flag commercial vessels,* in such manner as will insure a fair and reasonable participation of United States-flag commercial vessels in such cargoes by geographic areas. * * * (Emphasis supplied.)

---

1. Throughout this Memorandum Opinion and Order, reference will be made to various "rates," such as American-flag commercial rates, foreign-flag commercial rates, prevailing rates, market rates, etc. As used by the Court and, in the opinion of the Court, as used in the various committee hearings and reports cited and in the testimony before the Court, references to "rates," unless otherwise indicated by reference to particular, negotiated, ascertainable shipping charges, are not to any given set of published rates, but rather to the range and structure of shipping rates for the entire ocean freight market or for the part thereof indicated, which may and do vary greatly over short periods of time and which are in general incapable of precise delimitation. The terms are useful in the abstract for comparison purposes but delineate no concrete or easily ascertainable dollar figures.

Shipping terms for each of the government-financed shipments were negotiated in Germany between Maritime Cargo Agency G.m.b.H., Hamburg, as agents to States Marine Corp. of Delaware, agents for Bloomfiled Steamship Co., and Frachten-Treuhand G.m.b.H., Hamburg, as agents for the various German importers. Just as in the case of the commercial shipments, these negotiations culminated in fixtures, or agreements to terms, which were reduced to writing, as booking notes, and signed by the negotiators. Typical booking notes covering government-financed shipments contained a provision purporting to subject those notes to I.C.A. rules and regulations. Bills of lading issued at loading contained similar provisions. I.C.A. regulations provided, *inter alia*, that

> the rate charged by a supplier of ocean transportation services shall not exceed the prevailing rate for similar freight contracts nor the rate paid to the supplier for similar ocean transportation services by other customers similarly situated. 22 C.F.R. § 201.7.

The rates for neither commercial nor government-financed shipments were subject to shipping conference agreements, but in each and every case were separately negotiated.

Following loading of each of the government-financed shipments, States Marine Corp. of Delaware, as agents for Bloomfield, submitted invoices to Glaessel Shipping Corp., agent for the cargo, for the amount of the freight due. Submitted with each such invoice were executed copies of Form ICA–280. That form, called a supplier's certificate, was for use by I.C.A., and is promulgated by I.C.A. regulations at 22 C.F.R. § 210.18 (d). Among its standard printed provisions was the following:

> (9) If the supplier furnishes only a service, he * * * certifies that the rate indicated on the reverse of this

form for the service rendered does not exceed the prevailing rate, if any, for similar services or the rate paid to the supplier for similar services by other customers similarly situated.

The parties stipulated at length to data extracted from 192 ocean bills of lading covering parcel shipments of bulk grain transported during the years 1958 and 1959 between United States Gulf ports and ports of Northern Europe aboard Bloomfield vessels. These stipulations clearly show that the rates for government-financed shipments were substantially higher in all cases than the rates for commercial shipments during the same time periods. The government considers the rates for commercial shipments to have been the "prevailing rates," or the rates paid for similar services by other customers similarly situated within the purview of the next above quoted I.C.A. regulation and certificate I.C.A. Form 280, and the government therefore contends it has established a prima facie case for recovery against Bloomfield, on the basis that Bloomfield's certification that the rates charged on government-financed shipments did not exceed the "prevailing rate, if any, for similar services or the rate paid for similar services by other customers similarly situated" was false.

For the measure of its recovery, the government takes the amount by which freight charges on government-financed shipments exceeded what those charges would have been had each government-financed shipment been transported at the rate at which the commercial shipment nearest in point of time thereto had been shipped.

■ Without more, the position of the government is a compelling one. But there are problems which do not appear on the face of the government case. Those problems become clearer upon an analysis of Bloomfield's argument, of which there are several facets.[2]

2. Preliminarily, Bloomfield has suggested that the government has no standing to sue for these amounts because under the

applicable international agreement the Federal Republic of Germany paid for that portion of these transportation costs

Bloomfield contends that the relevant provisions of the I.C.A. regulations and of Form ICA–280 do not have the effect asserted by the government. It is Bloomfield's position that these provisions are subject to a different interpretation, but if not, that they are void as applied in this case because in derogation of the Cargo Preference Act, which Bloomfield sees as having been passed to aid United States-flag vessels with full knowledge and expectation that "fair and reasonable" rates for shipments thereunder might easily exceed regular commercial rates. No reported cases have interpreted either the statutory or regulatory provisions involved, and the case is therefore one of first impression.

Bloomfield views its rates, separately negotiated for each of the government-financed shipments, as having been fair and reasonable for United States-flag vessels in this trade. It is the contention of Bloomfield that the rates were at the time the prevailing rates for such trade, no greater than those charged by other United States-flag vessels for similar services performed for parties shipping government grain cargoes aboard United States-flag vessels pursuant to the requirements of the Cargo Preference Act. Thus, Bloomfield contends that its rates neither exceeded the prevailing rates nor those paid to it by other customers similarly situated, if by "other customers similarly situated" is meant, as Bloomfield thinks should be the case, other

shippers who are similarly bound by the Cargo Preference Act provisions. It is Bloomfield's position that such an interpretation of those provisions is the only one which will coincide with the congressional intent embodied in the Cargo Preference Act.

Bloomfield further contends that if the provisions of the form and regulation are interpreted as requested here by the government to compel a United States-flag carrier to carry government financed cargoes shipped on its United States-flag vessels at rates the carrier might be forced by foreign-flag competition to charge commercial shippers which are free to use foreign-flag vessels exclusively, then such provisions are null and void as so applied because they are contrary to the statutory purpose.

Bloomfield's final contention is that in equity the government should not be permitted to recover because the agencies concerned with these matters had full and complete knowledge that different rates had been and would be charged for I.C.A. as distinguished from commercial cargoes, and with such knowledge agreed to the terms of each shipment and paid the rates agreed upon.

■ Both parties agreed that the provisions of the Cargo Preference Act apply to the government-financed shipments involved here. And although the applicable provisions, quoted above, of Form ICA–280 and the I.C.A. regulations are both

---

on United States-flag vessels which equaled the freight rates which would have been charged had these grain parcels been shipped on German-flag ships. Thus, Bloomfield contends that the government has not properly established by pleadings and proof the extent of its alleged injury, because it has not attempted to establish what part of the alleged overcharges was borne solely by the United States government. Since the evidence and argument of counsel tends to establish that foreign-flag rates were even lower than United States-flag commercial rates, the Court believes it may be inferred that the amounts by which Bloomfield's rates are here alleged to have exceeded the United States-flag commercial rates were solely borne by the United

States government. But even if that were not the case, paragraph 1 of the supplier's certificate, Form ICA–280, should settle any problem in favor of the government's standing to sue. It provides:

"The supplier is entitled under said contract to the payment of the sum claimed and he will promptly make appropriate refund to ICA upon request of the Director in the event of his nonperformance, in whole or in part, under said contract, *or for any breach by him of the terms of this certificate.*" (Emphasis supplied.)

Bloomfield's agent signed supplier's certificates for each shipment, and the government here seeks recovery for an alleged breach of those certificates.

apparently of broad application and indicate no recognition of the special obligation imposed on I.C.A. and other government agencies by the Act, the government contends that those provisions correctly mirror the intent expressed in the Act. It is, well settled, of course, that an administrative rule or regulation which operates to create a rule out of harmony with the will of Congress as expressed by the statute is a mere nullity.[3] Therefore, vital to a proper determination of this case is an analysis of the Cargo Preference Act and the congressional intent underlying it.

As the government views the Act, it was intended only to provide cargoes for United States-flag shippers, not subsidies in the form of increased rates on government shipping. Thus, the government sees nothing in the Act which indicates that rates for shipments under the Act should be permitted to exceed United States-flag rates for regular commercial shipping. Bloomfield's interpretation of the Act, on the other hand, is that it was designed to aid United States-flag shippers who were faltering badly because of their inability to profitably compete with the foreign-flag operators, whose operating costs were much lower. Therefore, Bloomfield sees nothing incongruous in rates for shipments required by the Cargo Preference Act to be shipped on United States-flag vessels being higher than regular United States-flag commercial rates, which are of necessity greatly influenced by foreign-flag competition, so long as rates for shipments under the Act are fair and reasonable.

The Cargo Preference Act, 46 U.S.C.A. § 1241(b), contained the following relevant provisions when enacted as Public Law 664 in 1954:

(b) Whenever the United States shall procure, contract for, or otherwise obtain for its own account, or shall furnish to or for the account of any foreign nation without provision for reimbursement, any equipment, materials, or commodities, within or without the United States, or shall advance funds or credits or guarantee the convertibility of foreign currencies in connection with the furnishing of such equipment, materials, or commodities, the appropriate agency or agencies shall take such steps as may be necessary and practicable to assure that at least 50 per centum of the gross tonnage of such equipment, materials, or commodities (computed separately for dry bulk carriers, dry cargo liners, and tankers), which may be transported on ocean vessels shall be transported on privately owned United States-flag commercial vessels, to the extent such vessels are available at fair and reasonable rates for United States-flag commercial vessels, in such manner as will insure a fair and reasonable participation of United States-flag com-

---

3. Manhattan Gen. Equip. Co. v. Commissioner of Internal Revenue, 297 U.S. 129, 134, 56 S.Ct. 397, 80 L.Ed. 528 (1936). These particular regulations, including that promulgating Form ICA–280, were authorized during the pertinent period, 1958 and 1959, by provisions of the Mutual Security Act of 1954, sec. 525, 68 Stat. 856 (1954). The Mutual Security Act, passed almost simultaneously with the Cargo Preference Act, originally contained a provision which, although limited to shipments under Mutual Security Act programs, was almost identical to that of the Cargo Preference Act, and properly considered in *pari materia* therewith so that they should be construed with reference to each other. The Mutual Security Act provision, sec. 509, 68 Stat. 853 (1954), was repealed in 1957 insofar as

it was repetitive of the provisions of the Cargo Preference Act, 46 U.S.C.A. § 1241(b). The report of the committee of the House of Representatives which accompanied the statute repealing that portion of sec. 509 explained that "[t]he repealed language has been supplanted by the more stringent provisions of Public Law 664, 83d Congress (46 U.S.C. § 1241(b)); consequently, the first sentence is obsolete." House Report No. 776, July 9, 1957, 1957 U.S.Code Cong. & Adm.News pp. 1475, 1505. Thus, the I.C.A. regulations extant in 1958 and 1959 must be measured not only by the then current provisions of the Mutual Security Act but also by the expression of congressional will contained in the Cargo Preference Act.

mercial vessels in such cargoes by geographic areas: *Provided,* That the provisions of this subsection may be waived whenever the Congress by concurrent resolution or otherwise, or the President of the United States or the Secretary of Defense declares that an emergency exists justifying a temporary waiver * * *.

The only portion of the Act dealing with freight rates is the limiting provision, "to the extent such vessels are available at fair and reasonable rates for United States-flag commercial vessels." The Act neither defines "fair and reasonable rates" nor specifies how they shall be determined. But, fortunately, there are numerous congressional reports to which we may turn for aid.

The Committee on Merchant Marine and Fisheries of the House of Representatives, in its report which accompanied the bill, explained that:

> The purpose of the bill is to implement the policy * * * that the United States should have a merchant marine sufficient to carry a substantial portion of its water borne export and import foreign commerce. The higher American standard of living with the resultant higher operating costs to the American shipowner has made competition with low-cost foreign ships difficult, with the result that the proportion of cargoes carried in American bottoms has been constantly declining. From time to time there has been inserted in various foreign-aid bills a provision that at least half of the shipments be made in American-flag ships. The present bill serves to establish that principle on a permanent basis. H.R.

Rep. No. 2329, 83d Cong., 2d Sess. 1 (1954), U.S.Code Cong. & Admin.News 1954, p. 3173.

The report of the Committee on Interstate and Foreign Commerce of the Senate also accompanied the bill and contained expressions similar to those of the House report. The Senate report spoke of the "pitifully inactive" United States merchant marine and of the fact that government procurement practices often bypassed American shipping "with an eye to lower costs of transportation in foreign bottoms rather than to the policy of cargo preference to American shipping."

Subsequent to the passage of the bill, as a result of public criticism of the Act and its administration, the House Committee on Merchant Marine and Fisheries held additional hearings. The critics of the Act were complaining that a shortage of United States-flag ships was hindering the administration's program of selling farm surpluses overseas because at least 50 per cent. of those shipments were required by the Act to be made on United States-flag ships. It was also noted with disapproval by critics that a shortage of United States-flag vessels "was resulting in demands for exorbitant freight rates by available American shipping."

At the conclusion of its hearings the House committee issued a lengthy report. It began with a review of the background of the Act and the factors which necessitated its passage, emphasizing that rate competition from low-operating-cost foreign shipping would have been irreparably detrimental to the American merchant marine in the absence of the protection afforded by the Act.[4]

---

4. "Subsequent to World War II the merchant fleets of the world were returned to private operation, and restored * * * to approximately prewar size, long before any substantial revival of normal trade.

"During this period ocean shipping requirements, particularly to the devastated countries of Europe and the Middle East, remained at a very high level with the great bulk of cargoes going from the United States for the urgently needed relief and rehabilitation of those areas.

Early in this period it became apparent that normal commercial shipping practices were inconsistent with the abnormal foreign-aid programs. Without some form of assurance of participation by United States-flag vessels in the transportation of relief and aid cargoes, it became clear that the shipping of the recipient and other maritime nations with lower operating costs would be able to underbid American-flag vessels and eventually transport much, if not all, of these car-

Testimony was taken from representatives of the Department of Agriculture, the Foreign Operations Administration, the General Services Administration, the Federal Maritime Administration, the American-flag tramp shipping industry, the Conference of American Maritime Unions, and the major steamship associations. The main questions about which the committee's inquiry revolved were the alleged unavailability of American tonnage and its effect on ocean freight rates, the adequacy of the administration of the Act, and whether or not corrective action was necessary.[5]

goes to the irreparable detriment of the American merchant marine. * * * "Thus, as it became evident that substantial foreign-aid programs would comprise the bulk or great portion of our foreign trade for an indeterminate time to come the Foreign Assistance Act of 1948 * * * provided * * * that no less than 50 percent of goods procured in the United States out of funds made available out of that act should be transported on American-flag ships. The same or similar provisions, reflecting our national maritime policies with regard to the carriage of a substantial portion of our export and import foreign commerce have been incorporated in every major relief or foreign aid enactment since 1948. * * *

"In view of the history which preceded Public Law 664 and the continued unsettled conditions throughout the world, the Congress determined, by the enactment of the permanent Cargo Preference Act, to state our shipping policy in the clearest and most unequivocal terms for application in all cases where normal channels of international trade are disrupted by virtue of United States Government-controlled programs financed by Federal funds in whatever form they might take." H.R.Rep. No. 80, 84th Cong., 1st Sess. 3–4 (1955).

5. The position of the Department of Agriculture was explained by numerous of its officials. The Department's Assistant Secretary explained by letter that ocean transportation arrangements under its Public Law 480 programs through which grain was being shipped to Yugoslavia were being made by the Yugoslavian government, subject to the approval of the Department of Agriculture. As of the date of the letter, February 4, 1955, all such arrangements had been approved. It was, however, pointed out that in the course of approving transportation a steady increase in United States-flag rates had been observed. With negotiation of some rates and rejection of others the Department had approved fixtures on shipments from the Gulf to Yugoslavia at rates ranging from $16.25 per ton in January 1955 to $17.15 per ton in February 1955. The Assistant Secretary testified that in October 1954 the Department could reasonably have expected to fix vessels at rates from $12.50 to $13.60 per ton at United States Gulf ports.

Testimony of other officials of the Department of Agriculture, including the Director of Transportation and Warehousing Division and the Chief of the Ocean Transportation Section, Commodities Stabilization Service, was received. This testimony confirmed that ocean transportation was arranged through the Yugoslavian merchant marine mission:

"The mission works through its own brokers who scan the market for the best offers which are relayed through the mission to the Department of Agriculture for approval or rejection, if it appears that an offer is in excess of what the market appears to be for that day. Fixtures are made directly by the Yugoslavian Government representatives upon approval by the Department. This procedure is followed with respect to requirements for the entire program including arrangements for liner shipments in parcel lots." H.R.Rep. No. 80, 84th Cong., 1st Sess. 7 (1955).

These witnesses admitted that the Department neither had the information nor was in a position to establish a fair and reasonable rate within the meaning of the law, and that in an effort to overcome the difficulty of establishing a fair and reasonable rate the Department had adopted as a ceiling the rate set by the National Shipping Authority in 1951. The Department's representatives also conceded that dumping of large amounts of cargo on the market in a short time would have the effect of pushing the rates up. It was reported, with reference to an announcement by the Yugoslav mission that a canvass of the market on February 3, 1955, yielded no American-flag availabilities, that eight or ten ships were available at the time but for reasons unknown were not interested in offering for the Yugoslav requirements.

Representing the Administrator of the Foreign Operations Administration was the Director of the Office of Transporta-

After reviewing the testimony the committee set forth its findings and conclusions. It was felt that the Act was plagued by a lack of coordination among

tion. The Foreign Operations Administration was at the time concerned with movement of government-controlled cargoes under the Mutual Security Act of 1954, *under which the cargoes involved in this lawsuit originated.* At the time of these hearings the provision of the Mutual Security Act of 1954 similar to the Cargo Preference Act was still extant. See fn. 2. Its language referred to the availability of vessels "at market rates for United States-flag commercial vessels provided such rates are fair and reasonable." No indication is given of what "market rates" were considered to be, but in answer to an interrogatory concerning the failure at times to get bids from United States-flag vessels, "the Director of Transportation stated that the failure * * * was due to the absence of any indication on the part of the appropriate agencies of Government as to what a fair and reasonable rate is, and agreed that in view of the volume of the FOA program coupled with the agricultural program when we only have 70 tramp ships left we are fast approaching the stage where the rates of all American-flag tonnage will rise to a level at which it will be impossible to adhere to the 50–50 provision. He stated that it was well known in December 1954 that combined programs were to be underway in January, February, and March, 1955 which would provide more cargo for the proportionate American share than United States-flag tramps could move." H.R.Rep. No. 80, 84th Cong., 1st Sess. 9 (1955). The Director added that his department recommended more use of liners, such as the Bloomfield ships involved in this case, for carriage of parcel lots of bulk commodities. Finally, he stated that although there was a general rise in freight rates the world over at the time, the American flag rate had risen more rapidly because fewer ships were available.

The representatives of the General Services Administration testified that that agency at times procured ships for the Foreign Operations Administration for the transportation of its cargoes. The procurement procedure consisted of public advertisement for bids, receipt of sealed bids, public opening thereof, and finally, submission of the bids to the Foreign Operations Administration for approval or disapproval.

"As to the problem of determining fair and reasonable rates for United States-flag commercial vessels, GSA has made a practice of making its own computations on the basis of cost of operation and then checked them with the Maritime Administration to determine whether or not the rates were reasonable. Experience has shown that the comparative computations have closely approximated each other. The GSA witness testified that in his opinion the Maritime Administration is the appropriate agency to set the pattern and guide for the determination of fair and reasonable rates." H.R.Rep. No. 80, 84th Cong., 1st Sess. 10 (1955).

The Federal Maritime Administration was represented by the Administrator and the Director, National Shipping Authority.

"Testimony developed that while Public Law 664 places a responsibility for compliance with the law upon each administering agency, * * * the Maritime Administration has certain broad responsibilities with regard to its operation. Pursuant to these responsibilities Maritime Administration in recent months has offered the several administering agencies such information or assistance as they might be able to render * * *. Maritime does not conceive that it is charged with the duty of determining fair and reasonable rates, but has furnished guidance on the subject when requested by other agencies." H.R.Rep. No. 80, 84th Cong., 1st Sess. 10–11 (1955).

Concerning the alleged unavailability of United States-flag ships at various times "it was suggested that in that situation owners might have preferred not to bid for that particular business because of the prospect of other business more immediately available in an area closer to the position of their vessels. * * * It was stated, however, that there have been instances coming to the attention of NSA where American-flag vessels have been offered at rates which the shipping agencies of the Government believed to be too high for the purpose and were therefore rejected." H.R.Rep. No. 80, 84th Cong., 1st Sess. 11 (1955).

It was testified that the "former NSA rates were established by determining as far as possible the approximate average costs of private operation of American-flag, Liberty-type vessels, together with consideration of the cost of Government-operated vessels plus a fair and reasonable maximum level of elements normally incident to private operation such as depreciation,

the agencies involved.[6]  It was also concluded that the Act did not make clear where responsibility for its administration rested, although it implied that determinations should be made from time to time that privately owned United States-flag commercial vessels were available at fair and reasonable rates for United States-flag commercial vessels. The committee noted that there was no concurrence on the question how fair and reasonable rates should be calculated, and gave its own construction of the Act.[7] It is very clear that the committee did not consider market rates to be reliable indicia of fair and reasonable rates, and saw the problem of determining fairness and reasonableness as one which was not simple. It was the committee's view that the Act could not have caused delay in shipments of surplus agricultural commodities unless it had been improperly administered.[8]

insurance, and profit." H.R.Rep. No. 80, 84th Cong., 1st Sess. 11 (1955).

The Maritime Administrator commented that if there should be a shortage of American-flag vessels for a period no serious problem was posed since the contracting agencies might then go into the foreign market upon making the determination that American shipping was not available at fair and reasonable rates.

6. "If any one fact stood out from all the testimony adduced at the hearings, it was the lack of coordination among the several agencies charged with the administration of the transportation aspects of the foreign-aid programs. For the most part, the departments had little or no information as to the cargoes planned for shipment by other departments. Consequently, no attempt has been made to space the offerings so as not to unduly increase the freight rates at any one time. No effort has been made to obtain the rate concessions inherent in consecutive voyage charters. And the procedures by which the charters are arranged not only are not uniform among the departments, but are inefficient, uneconomical, and in some cases, represent a lack of good judgment." H.R.Rep. No. 80, 84th Cong., 1st Sess. 16 (1955).

7. "The alternatives seemed to be (a) market rates, or (b) rates based upon operating cost-plus reasonable profit. The committee referred this question to the Comptroller General of the United States. * * *

"In sum, the Comptroller General advises that the term 'would appear to call for reasonable compensation to the operator, including a fair profit.' Certain legislative history is cited as support for that view. He adds: 'However, it seems apparent that the statute contemplates average "fair and reasonable rates," which may or may not be profitable or even compensatory, to a high-cost operator.'

"The committee agrees with the Comptroller General's construction of the law. It must be clearly recognized, however, that the term has reference to a range of rates beyond which it is legally permissible to ship Government cargoes in foreign-flag vessels without regard to the 50 percent limitation. Also, it should be understood that at any one particular time market rates may be considerably less than this ceiling, in which event the chartering agency should feel free to exercise sound business judgment to secure the lowest rates possible for the Government. If every charter offered at or below the ceiling had to be accepted legally, it takes no great amount of foresight to realize that freight rates for United States-flag vessels would remain at the ceiling. The government must be in a position to take advantage of the pendulum of supply and demand when it swings in its direction." H.R.Rep. No. 80, 84th Cong., 1st Sess. 18 (1955).

8. "The act provides that whenever the United States is directly a party to programs for the acquisition or disposition of equipment, materials, or commodities, involving ocean transportation, including the advancement of 'funds or credits or guarantee the convertibility of foreign currencies' in connection with the furnishing thereof 'the appropriate agency or agencies shall take such steps as may be necessary and practicable to assure that at least 50 percent of the gross tonnage of such equipment, materials or commodities * * * shall be transported on commercial vessels, to the extent such vessels are available at fair and reasonable rates for United States-flag commercial vessels, in such a manner as will insure a fair and reasonable participation of United States-flag commercial vessels by geographic areas. * * *'

"Thus, the 50-percent limitation only applies when United States-flag commercial vessels are available at fair and

The report was concluded with certain recommendations, among them that government agencies should discontinue the practice of permitting representatives of foreign governments to arrange for shipments of cargoes subject to the limitations of the Act, that more utilization should be made of liner services, and that procedures should be established under which each of the agencies administering programs under the Act would exchange information and coordinate their activities for a more effective administration of the Act.

One year later the same House committee felt that additional hearings were required in view of continued attacks upon the operation of the Act. One of the primary criticisms was that the Act created an indirect subsidy in favor of the American merchant marine at the expense of the farm commodities disposal program because, on shipments required

by the Act to be made on United States-flag vessels, the amounts by which United States-flag rates exceeded foreign-flag rates had to be paid out of appropriations for the commodities program. Once again the committee took extensive testimony and issued a lengthy report.

Beginning with a warning about peacetime public apathy toward the merchant marine,[9] the report summarized the testimony that had been adduced and set forth the committee's conclusions and recommendations. It was the committee's determination that the Cargo Preference Act caused no serious detriment to government agricultural surplus disposal programs, and once again the extreme necessity of the Act for protection of the American merchant marine was emphasized.[10] In answer to the argument that the directly subsidized United States-flag *liner* fleet, of which Bloomfield's vessels are a part, should, in the absence of the

reasonable rates for such vessels. The minute the determination is made that no United States-flag vessels are available on fair terms, the Government agency charged with shipping the cargo is free to engage foreign-flag vessels without regard to the limitation. The only delay that could ensue would be attributable to the administrative action in determining availability.

"Representatives of the Department of Agriculture readily admitted to some uncertainty in administering the provisions of the Cargo Preference Act in connection with activities under Public Law 480. They stated they did not know what constituted the outside limits of fair and reasonable rates for United States-flag commercial vessels and thus were reluctant to go into the foreign-flag vessel market on the basis of a lack of availability of United States-flag ships." H.R. Rep. No. 80, 84th Cong., 1st Sess. 19 (1955).

9. "The real problem lies in public apathy toward the merchant marine in time of peace. For some reason, difficult to understand, the tendency in the past has been to treat the merchant marine as merely another segment of the American economy—an industry which should succeed in competition with its foreign counterparts or fade into the doldrums until the outbreak of another emergency." H.R.Rep. No. 1818, 84th Cong., 2d Sess. 2 (1956).

10. "Is the cargo-preference law essential to the American merchant marine?

"Definitely yes. The fact is that no member of the committee, informed as they are with respect to maritime matters, realized prior to the hearings just concluded how vitally necessary the Cargo Preference Act is to the American merchant marine. * * *

"There are today a little over 1,000 ships in the active operating American merchant marine. Even the most conservative estimates from defense experts place this figure as representing a deficiency of several hundred vessels from what would be needed immediately upon the outbreak of a new war. Moreover, today the American merchant marine is carrying about 23 percent of the export-import commerce of the United States. In exports alone, where the aid cargoes are assured to United States-flag ships by force of the 50-50 law, some statistics showed we are carrying only 16 percent overall and the foreigners, the remaining 84 percent.

\* \* \* \* \*

" \* \* \* Every competent maritime authority has stated that repeal of the cargo-preference law would result in the immediate demise of the entire American tramp fleet. The facts support this inasmuch as 78.5 percent of the business of American tramps during 1955 involved aid cargo. It is somewhat unusual that they were able to secure the remaining 21.5

Act, be able to compete profitably with foreign-flag operators on both commercial and government-sponsored shipments, the committee explained that there were many factors other than higher operating costs which place United States-flag liners at a competitive disadvantage.[11] Not the least of those factors was the shortage of American dollars available to foreign shippers for freight payments.

Then, in 1961, after the occurrence of the alleged overcharges involved in this lawsuit, the Senate Committee on Commerce issued a report which accompanied a successful bill to amend the Cargo Preference Act. The language of that report indicates that congressional policy remained unchanged. The amendment was for the purpose of aiding American-built shipping and preventing foreign-built ships from obtaining American registry in order to take advantage of cargoes under the Act. The language of the report would appear to give at least tacit recognition to the fact that higher rates on those government-sponsored cargoes restricted by the Act to American shipping meant that at that time of depressed foreign shipping markets ships could be more profitably operated under American registry.[12]

percent on a purely commercial basis. The only explanation is that they happened to have vessels in the right places at the right times.

"Aid cargoes accounted for 19.4 percent of American-flag liner carryings. If the 50–50 law were repealed, there is no reason to expect that the liners would be able to obtain any greater percentage of Government-sponsored cargo than in the case of their existing carryings of commercial cargo. The impact upon their financial condition which the loss of this business would entail could well mean the demise also of some of the marginal companies in the industry. It would also reduce the profit of even the most successful companies so seriously as to jeopardize the rebuilding program now just getting underway. Indeed, some companies might be so discouraged with the future prospects of the industry as voluntarily to abandon plans to replace their existing fleets." H.R.Rep. No. 1818, 84th Cong., 2d Sess. 27–28 (1956).

11. "It has been suggested, however, that the American-flag liner fleet should compete on equal basis for all cargo, both commercial and government-sponsored, and that the direct subsidy received by that segment should make such competition possible. The committee inquired into that phase of the problem specifically. It requested testimony from traffic men doing business on all three coasts of the United States and the direct question was put to them: Why can't you compete on equal basis with the foreign liners without the aid of 50–50?

"The answer lies in a combination of factors each detrimental to American-flag shipping. One reason is that the nationals of other countries prefer to ship under their own flag and take steps to see

that this is done. Shippers in this country do not have the same preference or at least do not have the bargaining power necessary to accomplish the result. There is, of course, the dollar exchange problem which provides added impulse to the foreign exporter or importer. He is in a position where he must conserve dollars.

"Another cause is traceable direct to the foreign governments themselves. * * * Whenever the opportunity presents itself, these governments direct or instruct that the cargo be shipped in vessels of its own flag. Unfortunately, those in charge of directing shipping for United States Government cargoes are not governed by the same policy. If they were specific legislation to effect cargo preference for Government-sponsored cargoes might not be necessary." H.R.Rep. No. 1818, 84th Cong., 2d Sess. 27 (1956).

12. "It has long been national policy to encourage the development and maintenance of an American-owned and American-built merchant marine manned by American citizen personnel. One of the means to this end has been the provision, first incorporated in the various foreign assistance statutes and, in 1954, made permanent by the enactment of Public Law 664—known as the 50–50 statute—that at least 50 percent of Government aid and Government-financed cargoes must be carried in U. S.-flag commercial vessels. Now however, there is only a limited amount of these 50–50 cargoes, and an oversupply of available U.S.-flag vessels in relation to the volume of cargoes to be moved. The result is an unhealthy shipping market, which has discouraged new unsubsidized vessel construction for U.S. registry.

"In the past few years an increasing number of foreign-flag vessels and vessels

■ Thus, the Act is accompanied by a rich legislative history which shows great congressional concern for the American merchant marine. Notably, there is no indication that the Congress intended that shipping rates under the Act should be limited to American-flag commercial rates. In fact, a reading of the statute's history loudly rebuts that theory. Only a complete discarding of the elementary supply-demand principle of price determination would allow one to argue that rates on government-financed shipments limited by the Act to United States-flag vessels should normally remain the same as American-flag rates on commercial shipments for which lower cost-lower rate foreign shipping was also available. In the absence of any statutory provision setting American-flag commercial rates as ceilings, it is my conclusion that Congress did not intend the Act to have such an effect, either per se or through agency interpretation such as the I.C.A. regulation and certificate provision here relied upon by the government.

That Congress intended a more realistic and flexible ceiling for rates on shipments under the Act is wholly reasonable. It cannot reasonably be said that Congress intended American-flag commercial rates to be used, because that would have seriously endangered the congressional purpose in passing the Act. Testimony before the House committee indicated that commercial ocean freight rates, American and foreign, were subject to great fluctuation, partially because of the disruptive effects of the dumping of aid cargoes on the market by American government agencies. Such testimony further indicated that without the ceiling on freight rates provided by the "fair and reasonable" provision of the Act, both American and foreign rates could have gone much higher in periods of great shipping activity, while in periods of diminished activity and therefore much lower foreign rates, American vessels, especially tramps, would in some cases have been unable to operate at rates competitive with foreign shipping, even with cargo to haul.

Congress adopted as its standard "fair and reasonable" rates and the Court finds the pertinent question here to be, how are such rates to be determined? Once again, the Act's legislative history is helpful. All of the agencies involved have grappled with the question what is meant by "fair and reasonable." Each of them, at one time or another, confessed lack of adequate information and expertise to make appropriate determinations because of the numerous intangibles involved, but it is clear that none of the agencies interpreted the Act to require, or allow, the use of American-flag commercial rates as a standard. The House Merchant Marine Committee, after considering testimony from the agencies, gave its own construction of the Act. That construction rejected the use of such market rates as the standard, and called for ceiling rates which would provide reasonable compensation, including a fair profit, to the average operator.[13] In fact, in its review of the committee reports and of the testimony presented in this case both by the government and by Bloomfield, the Court has found no evidence that anyone considered American-flag commercial market rates to be the measure of "fair and reasonable" rates under the Act in

built or rebuilt in foreign shipyards have been documented under American registry. The purpose, or at least one purpose, of so registering was to qualify these vessels for participation as American-flag ships under section 901(b), and thus to permit them to carry these cargoes restricted by law to American-flag vessels. Foreign shipping markets have been quiet, and the ships in questions could more profitably be operated under U.S. registry because of these 50–50 cargoes, so they have been transferred to American registry. No duty is paid on such foreign-built or foreign-rebuilt ships." S.Rep. No. 667, 87th Cong., 1st Sess. 2 1961, U.S.Code Cong. & Admin.News 1961, p. 2806.

13. See footnote 6.

1958 and 1959, or at any other time.[14] In fact, all the evidence has been to the contrary.

It is undisputed that the various agencies have established separate departments staffed with specialists in ocean transportation who have kept daily, even hourly, track of the ocean freight markets, collating information received through government and commercial channels and from all the private trade publications, in quest of the elusive "fair and reasonable" rate. The government's contention as represented by the evidence offered by it, that the determination of whether rates on the Bloomfield shipments under the Act are fair and reasonable involves *only* a simple comparison of those rates with Bloomfield's rates on commercial shipments of similar grains nearest in point of time, is weakly supported. The Court finds that such a comparison is not only inadequate to test the fairness and reasonableness of the rates charged by Bloomfield, it would impose as the sole criterion for such determination a test which was considered by the House Merchant Marine Committee in critical review of the Act after its passage, and by the Comptroller General at the Committee's request, and which was rejected by both.[15]

█ Thus, if the I.C.A. regulations upon which the government relies must be interpreted to require rates on government-financed shipments under the Act to be measured by rates on purely commercial shipments of similar grains on American-flag vessels to the same or nearby points, then those regulations are void as so applied because they are contrary to the statutory purpose of the Cargo Preference Act and, accordingly, the government would not be entitled to recover in its claim against Bloomfield, and the Court so finds and concludes in the event it should be in error as to the primary grounds of this decision which follows. But it is not necessary to hold such regulations void in order to determine this dispute. The regulations are sufficiently ambiguous when applied to the facts of this case that, reconciling any doubt in favor of their compliance with the statute, Bloomfield may be considered to have complied with them if it be correct in its contention that its rates charged for government-financed shipments are within the purview of the Act.

Since American-flag commercial rates are inappropriate standards by which to measure the fairness and reasonableness of Bloomfield's rates, what other criteria may be used? How are we to determine whether Bloomfield's rates were or were not fair and reasonable? A somewhat detailed analysis of the testimony concerning the negotiation of these rates will be helpful.

Both parties propounded certain interrogatories to Thomas F. Dunn, principal owner and manager of the Maritime Cargo Agency G.m.b.H., Hamburg, Germany, in 1958 and 1959. At that time Maritime Cargo Agency G.m.b.H. were European freight agents for States Marine Lines of New York, Bloomfield's agents. Maritime Cargo Agency G.m.b.H. therefore acted in 1958 and 1959 as broker for Bloomfield in the German trade. Dunn, in his capacities with that agency, supervised the negotiation of shipping terms for Bloomfield grain shipments to Germany, both commercial and government-financed, personally handling most of the negotiations. Those negotiations were

---

14. Only in the 1962 report of the Antitrust Subcommittee of the House Committee on the Judiciary, H.R.Rep. No. 1419, 87th Cong., 2d Sess. 280–284 (1962), obviously the genesis of the dispute being litigated here, does the Court find an instance where rates on government-financed shipments were attempted to be measured by commercial rates. A portion of that report critically commented

that Bloomfield's rates on these shipments exceeded its own contemporaneous commercial rates, but gave no recognition to the fact that the Cargo Preference Act applied on these shipments, or that there were grossly different factors involved in the two rate determinations. The report is silent as to the consideration, if any, given those factors.

15. See footnote 6.

conducted with representatives of Frachten-Treuhand G.m.b.H., Hamburg, who were the chartering agents for various German grain importers.

Each parcel of grain was dealt with separately, and the rate for each parcel, whether of commercial or government-sponsored grain, was separately negotiated in each instance. When Dunn and Frachten-Treuhand would, after extensive negotiation, come to terms on a given shipment, the proposed arrangement would be submitted to the principals of each for confirmation. After that confirmation had been received, Dunn prepared the booking note, signed it, and presented it to Frachten-Treuhand for signature, after which it was returned to Dunn. Notably, Dunn testified that

> the only difference between the way we negotiated shipment of ICA parcels and commercial parcels was that Frachten-Treuhand told me that for ICA parcels, in addition to telling me that the German charterers must approve the agreement, ICA must also approve. Usually Frachten-Treuhand told me ICA had approved a day or two later after I had been told the charterer had approved. * * * Shipper approval was obtained in order to insure that the grain berth would be available during the period of booking and we understood ICA approval was obtained as regards the rate. Answer to Interrogatories 18 and 33.

In no instance was a booking note prepared by Dunn prior to confirmation by the principals and, on I.C.A. shipments, receipt of notice from Frachten-Treuhand that I.C.A. approval had been obtained. Dunn was not told by Frachten-Treuhand who actually gave the I.C.A. approval, but it was his understanding that the approval was communicated to Frachten-Treuhand by the German Ministry of Transport, in Bonn. Dunn assumed that the German Ministry obtained approval from I.C.A. officials in Washington.

When asked by the government why booking notes prepared for government-financed shipments contained a clause purporting to subject them to I.C.A. regulations, Dunn answered that in the first such transaction with Frachten-Treuhand the confirmation of the terms of the booking received from Frachten-Treuhand included a sentence stating they required such a clause to be inserted in the booking note.

Dunn's testimony gives an extremely helpful insight into the rate differential between commercial and government-financed shipments. Dunn first learned from Frachten-Treuhand that parcels of I.C.A. grain would move from Gulf ports to Germany, and was asked whether space was available and what his rate would be. After consulting with his principals, Dunn quoted $14.50 to $15.00 per long ton, based on recent fixtures by American-flag vessels at $16.00 to Trieste and $16.50 to Rijeka. After considerable negotiation he and Frachten-Treuhand agreed on a rate for the first I.C.A. shipment, in early May 1958, of $13.50 per long ton, subject to shipper and I.C.A. approval, which was obtained. Dunn testified that at all times in 1958 and 1959 he and Frachten-Treuhand negotiated the I.C.A. shipment rates as nearly as possible to coincide with rates charged by other American-flag liners in similar trade. Dunn understood that Frachten-Treuhand would not agree to a proposed rate unless it was no higher than that of other American-flag vessels in the trade. Dunn was not familiar with I.C.A. regulations, except that he knew that I.C.A. grain was required to be shipped in part in American-flag vessels and at rates no higher than other American-flag vessel rates.

In explanation why rates on commercial shipments were lower than those for I.C.A. shipments, Dunn stated that since commercial parcels did not have to be shipped on American-flag vessels the rates offered for them had to be the same or about the same as rates of competing foreign-flag vessels. Furthermore, Dunn was led by Frachten-Treuhand to believe that in return for being given the I.C.A. grain shipments he would be expected to provide space for commercial shipments

at foreign-flag rates, which were perhaps not compensatory, at any time that Frachten-Treuhand was unable to obtain space on foreign-flag vessels, because of their being either out of position or fully booked.

Having presented a view of the negotiations in Europe through the Dunn interrogatories, Bloomfield brought forward the deposition testimony of Arthur S. Mason, who in 1958 and 1959 had been Chief of the Ocean Transportation Branch of the Department of Agriculture. At the time his deposition was taken Mason had retired from government service. He had no interest in the outcome of this litigation.

Mason had worked in the Department of Agriculture about forty years, much of which time he spent in the area of ocean shipping of agricultural products. He had retired in 1956, after having served four or five years as Assistant to the Director of Transportation, in which capacity he had been in charge of certain I.C.A. shipments, negotiating liner fixtures and charters. In the early part of 1958 he was asked by the Department to return to work and to assume the duties of Chief of the Ocean Transportation Branch, in which position he had the responsibility of seeing that the Cargo Preference Act was complied with on the various programs assigned to his Branch.

From the time of the passage of the Act through 1958 and 1959, when the rates alleged here to have been excessive were levied, there was a good deal of interagency discussion in the search for appropriate rate ceilings. Because of its extensive overseas surplus commodities disposal programs, the Department of Agriculture, or rather its Ocean Transportation Branch, developed a particular expertise in the determination whether ocean freight rates on government-financed shipments were fair and reasonable. Other agencies, including I.C.A., often sought the advice of personnel in that Branch.

On numerous I.C.A. programs, Mason and his staff actually negotiated transportation agreements as agents for I.C.A. However, on the shipments to Germany involved in this case, Mason testified that a different procedure was followed. Germany had been one of those maritime nations which had strenuously objected to the Cargo Preference Act, and because of its objections had been allowed by the State Department and I.C.A. to make its own fixtures, so long as rates were subject to prior approval.

When Mason became Chief in early 1958, he found a $13.50 rate on government-financed wheat shipments from the Gulf to Germany, which he thought was too high. He inquired who in his office had approved that rate, but no one had the information. He was, however, informed by an I.C.A. official that someone in I.C.A. had approved the rate. It is interesting to note that this is the same rate levied by Bloomfield on its first I.C.A. shipment, in early 1958. Shortly thereafter Bloomfield's rates cn these shipments dropped to $12.50 for a short while and then steadied at about $10.50 per ton. Mason explained that he refused to approve any more $13.50 rates, and that the Germans then negotiated directly with I.C.A. and obtained approval of a $12.50 rate. That rate was also unsatisfactory to Mason, and he had an agreement with I.C.A. that thereafter he, Mason, would be given complete authority over the determination of the rates to be approved and that the Germans would deal with him directly. He then fixed a $10.50 rate, which he approved as fair and reasonable based on the grain market at that time. He insisted that the Germans refer to him for approval all fixtures before shipments were made.

On all except the very first Bloomfield shipments, Mason testified that he personally had given approval of the rates as fair and reasonable. He was not aware who actually made the fixtures, although he knew they were made in Hamburg by someone with authority to do so. Mason explained that because of the fast-moving nature of the work, his

approval was usually given by phone to someone in the German Mission, and that he kept I.C.A. informed of his approvals, also by phone. Mason also related that the steamship companies normally submitted their invoices to the Germans, as done here by Bloomfield. Although he was aware that Bloomfield vessels were involved, Mason never communicated his approval of rates to Bloomfield; an agent of the Germans would communicate with Bloomfield's agents.

When asked about rates that were being charged in 1958 and 1959 for carriage of commercial grains on American-flag vessels, Mason explained that there was actually very little such grain carried on American-flag ships. Those rates were not considered in his setting of rate ceilings under the Cargo Preference Act, which were based on costs of operation. Mason said that American shippers often took commercial shipments at less than the cost of operations, because filler cargoes were needed and because low rate cargoes were often accepted as part of a package which included a higher rate cargo on which the rate might be fixed by a tariff agreement and not therefore subject to negotiation.

The government has attempted to discredit a major portion of Mason's testimony by presenting deposition testimony of various other employees of the Department of Agriculture who say the rates on these Bloomfield shipments were never presented to the Ocean Transportation Branch for approval. The Court finds, however, for reasons hereinafter indicated, that Mason's testimony is the more credible. The Court's findings here, insofar as they involve the areas testified to by Mason which are to some extent apparently in conflict with the testimony of his associates, are predicated on his testimony as the more credible and the Court rejects theirs as the less credible.

Joseph A. Ryan succeeded Mason as Chief of the Ocean Transportation Branch. He testified, as had Mason, that his Branch dealt with ocean freight rates under the Cargo Preference Act. He affirmed that his Branch actually negotiated fixtures on some programs, and on others merely indicated rate approval. But when asked about the Bloomfield shipments, Ryan denied that his office had ever been informed of those shipments or had ever approved any of them. But upon cross-examination Ryan did admit that during 1958 and 1959 the personnel of the Branch had been available to other agencies for advice on ocean freight rates, that he had not in those years been familiar with every transaction in which the Branch engaged, and further, that it was possible that I.C.A. had consulted with Mason or other personnel of the Branch on ocean freight rates to Germany without his knowledge.

The government also presented the deposition of Gerald L. Healey, Assistant Chief of the Ocean Transportation Branch. He had been employed, in a clerical position, in the Branch in 1958 and 1959 when Mason had been Chief. Healey testified, as did Ryan, that the rates on Bloomfield shipments had not been approved by his office. But he explained that he was not in the same office with Mason and was in no position to have overheard Mason's telephone conversations.

Finally, the government presented the deposition of Martin J. Hudtloff, Director of Transportation Services Division, Department of Agriculture. Hudtloff testified that in 1958 and 1959 Mason had been in charge of the Ocean Transportation Branch of his Division and, as such, was the person in the organization most intimately concerned with ocean freight rates. He also testified that during those years the Branch had acted as agents for I.C.A. on certain programs and were in daily communication with them. But Hudtloff flatly denied that his people were ever informed of the Bloomfield shipments to Germany, explaining upon cross-examination that he relied for that information on discussions with Ryan and Healey and on his inability to find records to that effect.

Thus, the Court is in some areas faced with the choice between the testimony of Mason on the one hand and that of Ryan, Healey and Hudtloff on the other. For a number of reasons, the Court is disposed to accept Mason's testimony as the more credible and accurate. Being retired, Mason no longer works for the government. Furthermore, he was obviously highly qualified to aid I.C.A. in its approval or disapproval of these rates. He testified at length concerning his role in connection with the transactions here in question and the ways in which the negotiations were culminated. His testimony is corroborated by and meshes with that of Dunn, and his knowledge of rate fluctuations in this very trade was corroborated by an analysis made during trial at the Court's suggestion of numerous cablegrams, Exhibits Nos. 1 through 4 attached to the Dunn Interrogatories, obtained from Dunn's Maritime Cargo Agency files. This record shows almost without contradiction that Mason had intimate contact with this particular trade in 1958 and 1959. His failure in his deposition to correctly recall some rather technical details, having had no opportunity to refresh his memory by reviewing agency records, does not derogate his testimony. Neither Ryan, Healey nor Hudtloff were as involved in these matters as was Mason, and it would easily have been possible for Mason, as Chief, to have undertaken the responsibility of advising as to the reasonableness of these rates for I.C.A. without the knowledge of others in his very busy office. The Bloomfield shipments, less than fifty over a two-year period, were but a drop in the bucket compared with the total volume of work being done in the Branch.

■ Furthermore, the government failed to produce witnesses from I.C.A. to rebut the assertion made by Mason that he had undertaken the task of approving these rates at their suggestion. The failure of the government to produce the testimony of those government employees with whom Mason testified he communicated about the Bloomfield rates not only justifies but compels the inference that such testimony would have been unfavorable to the government.[16]

■ Thus, all the evidence before the Court is that the rates charged by Bloomfield were "fair and reasonable," although they were obviously in excess of the rates charged by Bloomfield on contemporaneous commercial shipments. The government made no attempt to show that Bloomfield's rates on their government-financed shipments were in excess of rates normally charged for similar service on government-financed cargoes, and there is adequate evidence to the effect that other shippers were charged similar rates on government-financed cargoes. Nor did the government make any attempt to show what were the "prevailing rates" which Bloomfield's rates on these shipments were not to exceed, other than by comparison with Bloomfield's rates on certain commercial grain shipments, most of which were on different ships and at different times than the shipments of government-financed grains. Perhaps there is no prevailing rate, but if there is one, in the fluid and changeable ocean freight market, even if commercial rates had been properly comparable, such an inexact comparison as made here by the government falls far short of establishing it.[17]

Cumulative of the foregoing and specifically the Court finds as follows with respect to the rates charged by Bloom-

16. See, e. g., Interstate Circuit, Inc. v. United States, 306 U.S. 208, 226, 59 S.Ct. 467, 474, 83 L.Ed. 610 (1939) ("The production of weak evidence when strong is available can lead only to the conclusion that the strong would have been adverse.") ; United States v. Johnson, 288 F.2d 40, 45 (5th Cir. 1961) ; Illinois Central R.R. v. Staples, 272 F.2d 829, 834 (8th Cir. 1959) ; Blumenthal v. United States, 189 F.Supp. 439, 448 (1960).

17. Smith v. Joseph, 275 App.Div. 201, 88 N.Y.S.2d 818, 820.

field on the government-financed cargoes involved here:

1. Such rates were fair and reasonable;

2. Such rates were not in excess of prevailing rates on shipments under the Cargo Preference Act;

3. Such rates did not exceed those rates which Bloomfield would have charged other shippers for government financed cargoes under the ·Cargo Preference Act;

4. Such rates comply with the valid and applicable I.C.A. regulations;

5. Such rates did not exceed (a) those prevailing for similar freight contracts, nor (b) those paid to suppliers for similar ocean transportation, at or about the same time by other customers similarly situated;

6. Those Bloomfield customers which shipped commercial grains on Bloomfield vessels, at rates which the government compared with Bloomfield's rates on government-financed grain shipments in an attempt to establish the illegality of the latter, were not similarly situated to the Bloomfield customers which contracted for the carriage of government-financed grain at rates here in controversy.

▇ Even if the assumption were made for purposes of argument that American-flag commercial market rates were contemplated by the statute as appropriate ceilings, or that Bloomfield's rates were not in fact fair and reasonable, the additional question exists whether the government, which was not a party to the fixtures in controversy, may now impose upon Bloomfield a reexamination of the matters at issue. It it crystal clear from an analysis of the legislative history of the statute that the various agencies were only required to use United States-flag vessels when such vessels were available at fair and reasonable rates.[18] At any time an agency was unable to obtain American-flag vessels at such rates, it was freed of the shackles of the Act and could immediately turn to lower cost foreign shipping. The committee reports are replete with such declarations, and there is a large body of testimony that proffered rates were fairly often rejected upon being submitted by the negotiators to the appropriate government agency for approval. Thus, the statute clearly sets up the "fair and reasonable rate" test as a measure of availability of American shipping, with the agencies free to go elsewhere in the absence of American shipping meeting that test of availability. There is absolutely no doubt that the statute does not require government agencies to accept any rates offered, with the operator being assumed to have warranted the fairness and reasonableness thereof.

Since it is reasonable to assume that the appropriate government agencies in this case reviewed the rates offered by Bloomfield to the German importers, as it would have been their duty to do under the Act, and since, and the Court so finds, the rates were either approved or accepted by officials in the agencies involved as fair and reasonable for purposes of measuring the availability of the Bloomfield ships, the serious question is raised whether the government should now be allowed to proceed on the theory that the rates were not fair and reasonable. Bloomfield, relying at the time these rates were contracted on agency and congressional interpretation which had been consistent from the time of the passage of the Act, had every reason to believe its rates were fair, reasonable and lawful, and were approved as such prior to acceptance. As a matter of statutory interpretation, if nothing else, the government should not now be allowed to take a contrary position on those rates, to Bloomfield's detriment. Luckenbach S.S. Co. v. United States, 280 U.S. 173, 182, 50 S.Ct. 148, 74 L.Ed. 356 (1930).

▇ But, in addition, the government brings its action as one for money

18. See, e. g., footnote 7.

had and received, which is of an equitable nature, premised on the assertion that money is held by Bloomfield when in equity and good conscience it belongs to the government. See, e. g., Okeechobee County, Fla. v. Nuveen, 145 F.2d 684, 687 (5th Cir. 1944). To such action Bloomfield may interpose any defense that shows the government in equity and good conscience is not entitled to recover. In the absence of a frustration of the laws or public policy, the government may not invoke the aid of a court of equity if its conduct is such that it comes into court with unclean hands. Deseret Apartments v. United States, 250 F.2d 457, 458 (10th Cir. 1957). For the government to request, as it does here, for the Court to grant a crippling $270,000 recovery against a party which the Act was primarily designed to protect, which reasonably believed its rates to have been accepted by I.C.A. as fair and reasonable, which might well have been unwilling to offer for these cargoes at lower rates, and which might have been able to substitute commercial cargoes of any of a number of types for satisfactory rates had I.C.A. refused its rate offers on these shipments, does not satisfy the requirement that it do equity in order to receive equity. Moreover, the Court feels that to permit such a recovery would constitute a violation of the spirit as well as the letter of the Act.

This is not a case in which the government has no protection. The very provisions of the Act provide ample safeguards, and in fact the Act will not have all of its desired and desirable effects unless government agencies reject rate offers which are not fair and reasonable. If the government had attempted to show the Court with appropriate evidence that the rates were not in fact fair and reasonable, the outcome might have been different. That has not been done. The government has wholly failed to carry its burden. Furthermore, Bloomfield has presented totally satisfactory evidence to support the fairness, reasonableness and lawfulness of its rates. The government is therefore entitled to no recovery against Bloomfield.

This Memorandum Opinion and Order shall constitute the Findings of Fact, Conclusions of Law and Order of this Court, which the Clerk shall file and of which he shall furnish each of the parties a copy.

